# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVAIA

| In re: | : | Case No. 1:19-bk-03013-HWV |
|---|---|---|
| | : | |
| GVM, Inc., et al., | : | CHAPTER 11 |
| | : | Jointly Administered with |
| Debtor. | : | Case No. 1:19-bk-03014-HWV |
| | : | Case No. 1:19-bk-03015-HWV |

## OPINION

This matter came before the Court for hearing on August 8, 2019 (the "Hearing") regarding the Motion of GVM, Inc. ("GVM") and Independent AG Equipment, Inc. ("IAE") Pursuant to 11 U.S.C. §§ 105, 363 and 364 for an Order Authorizing the Payment of Certain Prepetition Claims of Critical Vendors and for Expedited Relief (the "Motion"), and the Objections filed thereto by PeoplesBank, a Codorus Valley Company ("PeoplesBank"), Moneycorp US, Inc. ("Moneycorp"), Bell Power Systems, LLC ("Bell Power"), and the Office of the United States Trustee ("UST") in the above-referenced bankruptcy cases. In the Motion, GVM and IAE (collectively, the "Debtors") seek entry of an order authorizing the payment of certain prepetition claims of critical vendors pursuant to §§ 105, 363 and 364 of title 11 of the United States Bankruptcy Code[1] in an aggregate amount not to exceed $2,900,000.00 on the ground that the goods and services they provide to the Debtors are critical to their continued viability and reorganization.

## I.     Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code")

1

## II. Facts and Procedural History

GVM is a family-owned business operating as a manufacturer and distributor of agricultural equipment and supplies throughout the eastern United States. GVM primarily manufactures heavy agricultural equipment used for spreading and spraying liquid or dry fertilizers and pesticides. It also manufactures equipment used for applying anti-icing treatment to roads, which makes use of technology similar to its agricultural spreaders and sprayers. IAE is a distributor and servicer of new and used agricultural equipment and accessories. GVM sells its products through IAE and through third-party distributors. IAE sells products manufactured by both GVM and by third-party original equipment manufacturers. The Debtors each filed a voluntary petition for reorganization under chapter 11 of the Code on July 13, 2019 (the "Petition Date"). By Order of this court entered on August 13, 2019, these cases are being jointly administered for the convenience of the parties.

The Debtors have identified approximately 46 vendors they deem critical. These critical vendors, according to the Debtors, are vital to their reorganization because of the highly specialized technical products and services they provide. Mot. 4–5. The Debtors further assert that these critical vendors are highly trained and skilled in the goods and services they provide for the Debtors and their businesses, and it would be unnecessarily burdensome to replace them. Mot. 5. In their Motion, the Debtors also allege that the failure to pay these critical vendors could result in many of them refusing to provide services and products to the Debtors on a post-petition basis. Mot. 5. Finally, the Motion relates that "any interruption in the services and products the Debtors provide to their customers would have an immediately devastating effect on the Debtors' ability to operate, causing immediate and irreparable adverse repercussions on the Debtors' estates and creditors." Mot. 5.

2

Case 1:19-bk-03014-HWV    Doc 100    Filed 09/06/19    Entered 09/06/19 10:45:46    Desc
Main Document    Page 2 of 12

The Debtors propose to pay the prepetition claim of each critical vendor in exchange for their agreement to continue to supply goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties. According to the Motion, proceeding this way will allow the Debtors to preserve working capital while maintaining optimal development and production levels, thus maximizing value for the benefit of all of their creditors. Conversely, they claim that a reduction in post-petition trade credit will hamper the Debtors' business operations, increase the amount of post-petition funding needed to operate, and ultimately hinder their ability to reorganize or sell to the detriment of all of their creditors.

It is undisputed that many of the prepetition claims of the critical vendors are unsecured except for some portion that may be entitled to priority under § 507(a)(2). GVM Suppl. Trial Ex., ECF No. 106; IAE Suppl. Trial Ex., *In re Independent AG Equipment, Inc.*, (No. 19-03014) ECF No. 76. GVM proposes to pay in full the prepetition claims of 29 separate vendors in the aggregate amount of $1,332,859.71. GVM Suppl. Trial Ex., ECF No. 106. In turn, IAE proposes to pay in full the prepetition claims of 17 separate vendors in the aggregate amount of $2,487,704.52. IAE Suppl. Trial Ex., (No. 19-03014) ECF No. 76.

PeoplesBank has objected to the Motion asserting that the Debtors' financial condition is such that they are incapable of a successful reorganization even if the Motion is granted, and that granting the Motion will simply result in PeoplesBank having less collateral when the cases fail. PeoplesBank also argues that the Debtors have failed to establish that the vendors identified as critical will cease doing business with the Debtors if their prepetition claims are not paid and that the loss of these vendors will prevent a successful reorganization. Moneycorp has also objected to the Motion contending that the Code contains no provision allowing for the payment of prepetition claims to critical vendors in order to induce those vendors to continue providing

3

services to support reorganization. To the extent this practice has occurred, according to Moneycorp, it has been derived from the courts' general equitable powers and the equities in this case do not favor such relief because of the Debtors' prepetition conduct. Bell Power has also filed a limited objection averring that consideration of the Motion should be deferred until all prospective critical vendor claims can be verified. Finally, the UST has filed a limited objection asserting that the Debtors have failed to identify the potential critical vendors and how much they are owed. The UST also avers that the Debtors have failed to prove that, but for the immediate full payment, vendors would cease dealing and that the business will gain enough from continued transactions with the favored vendors to provide some residual benefit to the remaining disfavored creditors, or at least leave them no worse off as required by *In re Kmart Corp.*, 359 F.3d 866, 868 (7th Cir. 2004).

### III. Discussion

To begin, the court must reconcile a conflict between two primary objectives of the bankruptcy process. The first objective is to provide for the equitable distribution of assets of a debtor to its creditors. In the context of Chapter 11, this generally requires the treatment and payment of all creditor claims through a confirmed plan of reorganization or a court ordered liquidation. *See* 11 U.S.C. § 1129(b)(1). The second objective is to rehabilitate the debtor and achieve a successful reorganization. To accomplish this second objective, debtors frequently assert that it is necessary for them to pay the prepetition claims of certain creditors, such as employees or suppliers, prior to confirmation of a plan because of their importance to continued operations. The balancing of these fundamental objectives has led to numerous and divergent decisions regarding whether or not to authorize payments of prepetition claims prior to confirmation of a plan.

4

Historically, some courts have allowed a chapter 11 debtor to pay the prepetition unsecured claims of certain creditors prior to confirmation of a plan. *See In re Just for Feet, Inc.*, 242 B.R. 821 (D.Del. 1999); *In re Chateaugay Corp.*, 80 B.R. 279 (S.D.N.Y. 1987); *In re Chateaugay Corp.*, 64 B.R. 990 (S.D.N.Y. 1986); *In re CoServ*, 273 B.R. 487 (Bankr. N.D.Tex. 2002); *In re NVR L.P.*, 147 B.R. 126 (Bankr. E.D.Va. 1993); *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D.Del. 1992); *In re Gulf Air, Inc.*, 112 B.R. 152 (Bankr. W.D.La. 1989); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989); *In re Structurlite Plastics Corp.*, 91 B.R. 813 (Bankr. S.D.Ohio 1988). Others have struggled to find authority in the Code to elevate the prepetition claims of such creditors in violation of the priority scheme established in 11 U.S.C. § 507. *See Official Committee of Equity Sec. Holders v. Mabey*, 832 F.2d 299 (4th Cir. 1987); *In re Revco D.S., Inc.*, 91 B.R. 777 (Bankr. N.D. Ohio 1988); *In re FCX, Inc.*, 60 B.R. 405 (E.D. N.C. 1986); *In re Wexler Knitting Mills*, 44 B.R. 1019 (Bankr. E.D. Pa. 1984); *In re Vermont Real Estate Inv. Trust*, 25 B.R. 806 (Bankr. D. Vt. 1982); *see also Matter of Crowe & Associates, Inc.*, 713 F.2d 211 (6th Cir. 1983). While the above-cited cases provide an interesting historical context, it is the more recent decision of *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) that this court finds persuasive and guiding in this matter.

In *Kmart*, the debtor sought permission to immediately pay in full the prepetition unsecured claims of vendors it deemed critical. The theory behind the request was that some suppliers might cease doing business with the debtor post-petition if they were not paid on their prepetition claims. If this occurred, reasoned the debtor, it might be unable to continue its business which would injure all of its creditors. Thus, according to the debtor in *Kmart*, full payment to vendors deemed critical could conceptually make even the disfavored creditors better off. The bankruptcy court in *Kmart* apparently agreed with the debtor in this regard and granted the critical vendor request. It did so,

however, without making a finding that the critical vendors would actually cease dealing with the debtor post-petition if they were not paid.  It also did not find that the disfavored creditors would indeed gain or at least remain even as part of the process.  A disfavored creditor promptly appealed the critical vendor order to the United States District Court for the Northern District of Illinois.  The district court reversed the bankruptcy court concluding that neither § 105(a) nor the "doctrine of necessity" supported the critical vendor order.  The debtor appealed the district court's reversal to the United States Court of Appeals for the Seventh Circuit.

On appeal to the Seventh Circuit, the debtor in *Kmart* relied upon §§ 105(a), 363(b), 364(b), and 503 as sources of authority for the critical vendor order.  After analyzing those sections one by one and rejecting each of them as a source of authority for the critical vendor order, the Circuit Court in *Kmart* disagreed with the debtor and affirmed the district court's reversal of the bankruptcy court's critical vendor order.

In so doing, the Circuit Court in *Kmart* began by reviewing § 105(a) and noting that it "does not create discretion to set aside the Code's rules about priority and distribution; the power conferred by § 105(a) is one to implement rather than override." *Kmart*, 359 F.3d at 871.  (citations omitted).  The Circuit Court then observed that "[e]very circuit that has considered the question has held that this statute does not allow a bankruptcy judge to authorize full payment of any unsecured debt, unless all unsecured creditors in the class are paid in full." *Id*. (*citing In re Oxford Management Inc.,* 4 F.3d 1329 (5th Cir. 1993); *Official Committee of Equity Security Holders v. Mabey,* 832 F.2d 299 (4th Cir. 1987); *In re B & W Enterprises, Inc.,* 713 F.2d 534 (9th Cir. 1983).  The Seventh Circuit Court agreed with that view of § 105(a).  In so doing, the Circuit Court opined that the fact that a bankruptcy proceeding is equitable "'does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness,

6

however enlightened those views may be.'" *Kmart*, 359 F.3d at 871 (quoting *In re Chicago, Milwaukee, St. Paul & Pacific R.R.,* 791 F.2d 524, 528 (7th Cir. 1986).

Having determined that § 105(a) was not a legitimate source of authority for the critical vendor order in *Kmart*, the Circuit Court next analyzed § 364(b), which provides: "The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense." 11 U.S.C. § 364(b). After reviewing this language, the Circuit Court in *Kmart* plainly stated that this section merely "authorizes the debtor to obtain credit (as Kmart did) but has nothing to say about how the money will be disbursed or about priorities among creditors." *Kmart*, 359 F.3d at 872. The Circuit Court in *Kmart* thus rejected § 364(b) as a legitimate source of authority for the critical vendor order.

The last Code section analyzed by the Circuit Court in *Kmart* was § 363(b)(1), which provides: "The trustee [or debtor in possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Circuit Court found this avenue more promising than the others because "satisfaction of a prepetition debt in order to keep 'critical' supplies flowing is a use of property other than in the ordinary course of administering an estate in bankruptcy." *Kmart*, 359 F.3d at 872. Because of this, the Circuit Court opined that a broad reading of § 363(b)(1) might support a critical vendor order while a narrower reading may not. *Id*. Nonetheless, the Circuit Court in *Kmart* determined that it need not decide whether § 363(b)(1) could support payment of some prepetition debts, because the specific critical vendor order before it was unsound no matter how one reads § 363(b)(1). *Id*.

In support of this finding, the Circuit Court in *Kmart* returned to the foundation of the critical vendors order. That foundation was the belief that if vendors were not paid for prior deliveries, they would refuse to make new ones. *Id*. Without goods to sell, the debtor could be forced to close. If paying critical vendors would enable a successful reorganization and make even the disfavored creditors better off, then all creditors should favor such payment whether or not they are designated as critical. *Id*. For this premise to hold true, noted the Circuit Court in *Kmart*, "it is necessary to show not only that the disfavored creditors *will* be as well off with reorganization as with liquidation . . . but also that the supposedly critical vendors would have ceased deliveries if old debts were left unpaid while the litigation continued." *Id*. at 873 (emphasis in original). Indeed, noted the Circuit Court in *Kmart*, "if vendors will deliver against a promise of current payment, then a reorganization can be achieved, and all unsecured creditors will obtain its benefit, without preferring any of the unsecured creditors." *Id*.

Yet the bankruptcy court, according to the Circuit Court in *Kmart*, "did not find that any vendor would have ceased doing business with Kmart if not paid for pre-petition deliveries, and the scant record would not have supported such a finding had one been made." *Id*. at 874. Nor did the bankruptcy court "find that discrimination among unsecured creditors was the only way to facilitate a reorganization." *Id*. Finally, noted the Circuit Court in *Kmart*, the bankruptcy court "did not find that the disfavored creditors were at least as well off as they would have been had the critical-vendors order not been entered." *Id*. In view of the foregoing, the Circuit Court in *Kmart* concluded that even if § 363(b)(1) could be read to allow a critical vendor order in principle, "preferential payments to a class of creditors are proper only if the record shows the prospect of benefit to the other creditors. This record does not, so the critical-vendors order cannot stand." *Id*.

The present court concurs with the analysis and conclusions of the United States Court of the Appeals for the Seventh Court in *Kmart*, particularly as they relate to the authority granted and limitations imposed thereon by §§ 105(a), 364(b), and 363(b)(1). Regarding the authority conferred upon this court pursuant to § 105(a), the United States Court of Appeals for the Third Circuit has recently held that "[w]hile § 105(a) is both a powerful and versatile tool, it operates solely within the context of bankruptcy proceedings." *Thomas v. City of Philadelphia*, 759 F. App'x 110, 111 (3d Cir.), cert. denied sub nom. *Thomas v. City of Philadelphia, Pa.*, 139 S. Ct. 2703 (2019) (citing *In re Morristown & Erie Railroad Co.*, 885 F.2d 98, 100 (3d Cir. 1990). In *Thomas v. City of Philadelphia*, the Third Circuit reaffirmed its holding in *Morristown* providing "that § 105(a) 'authorizes the bankruptcy court, or the district court sitting in bankruptcy, to fashion such orders as are required to further the substantive provisions of the Code.' But § 105(a) does not give 'the court the power to create substantive rights that would otherwise be unavailable under the Code.'" *Id.* (quoting *Morristown & Erie Railroad Co.*, 885 F.2d at 100). Because the conclusions of the Seventh Circuit in *Kmart* are entirely consistent with the limitations of § 105(a) as recognized by the Third Circuit in *Thomas* and *Morristown*, this court concludes that § 105(a) "does not allow a bankruptcy judge to authorize full payment of any unsecured debt, unless all unsecured creditors in the class are paid in full." *See In re Kmart*, 359 F.3d at 871; *Thomas v. City of Philadelphia*, 759 F.App'x at 111; *see also* 11 U.S.C. § 1129.

Regarding § 364(b), this court concurs with the Circuit Court's finding in *Kmart* that the plain language of this section merely "authorizes the debtor to obtain credit . . . but has nothing to say about how the money will be disbursed or about priorities among creditors." *Kmart*, 359 F.3d at 872. To the extent that other cases come to the opposite conclusion, this court disagrees.[2] If

---

[2] *See, e.g., In re Payless Cashways, Inc.*, 268 B.R. 543 (Bankr. W.D.Mo. 2001).

9

congress intended this section to contain an express grant of authority for debtors to prefer some vendors over others as proposed here, then it could have included language to that effect. It did not. Presuming that Congress "says in a statute what it means and means in a statue what it says there", this court concludes that the failure to include such language was intentional. *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3rd Cir. 2010) ("Courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (internal citations and quotations omitted).

Finally, this court agrees with the Circuit Court's conclusion in *Kmart* that § 363(b)(1) provides the most promising avenue for the relief sought here. Unfortunately, just like the debtor in *Kmart*, the Debtors here have failed to prove, and not just allege, the elements necessary for a critical vendor order under even the broadest reading of § 363(b)(1). Assuming that § 363(b)(1) does contain a grant of authority for debtors to prefer some vendors over others (an assumption that this court does not presently make), the Debtors must still prove that the favored vendors will cease to do business with them post-petition unless their prepetition debt is paid. *Kmart*, 359 F.3d at 868. In addition, according to the Circuit Court in *Kmart*, the Debtors must also prove that their businesses will gain enough from continued transaction with the favored vendors to provide some residual benefit to the remaining disfavored creditors, or at least leave them no worse off. *Id*. The Debtors in this case did not prove either of these elements. As a result, this court need not decide whether § 363(b)(1) could support payment of some prepetition debts because the relief requested here is not supported by the record.

Consider the testimony of GVM's President and owner, Mark Anderson. When asked if one of the 29 critical vendors had advised GVM that it "would refuse to provide product in the future" unless their prepetition claim was paid in full, Mr. Anderson responded as follows: "None

of these people have said that." See Hr'g Tr. 101:23–25. Following that testimony, counsel for the UST asked the following clarifying question of Mark Anderson: "Let me just make sure I'm summarizing this, and I get it straight. So looking at . . . the GVM critical vendor list, did I understand you correctly to say that none of these vendors have said to GVM that they refuse to provide product post-petition unless their prepetition balances were paid in full?" Hr'g Tr. 102:21–25; 102:1. In response to that query, Mark Anderson, as President and Owner of GVM stated, "[y]ou summarized that correctly." Hr'g Tr. 102:7. Likewise, when asked if it would be accurate to say the same summary for IAE's critical vendors, that none of them have said to IAE that "they refuse to provide post-petition product unless their prepetition bill was paid in full", Mark Anderson, as President and owner of IAE, responded "No, all these customer – all these vendors agreed to do business with us . . . [and] not take our products away from us." Hr'g Tr. 103:16–24.

Not only does this testimony fail to prove that the critical vendors will cease doing business with the Debtors unless they are paid for their prepetition deliveries, it actually establishes the opposite—that the vendors will continue to do business with the Debtors even if they are not paid for their prepetition deliveries. This testimony alone prohibits the Motion from being granted.[3] In addition, this court further finds that the Debtors have also failed to establish that the disfavored creditors will be at least as well off as they will be if the Motion is denied. Aside from general allegations to that effect, the record is completely devoid of testimony or other credible evidence supporting this element. Even if § 363(b)(1) allows critical vendors orders in principle, preferential payments to a class of creditors are proper only if the record shows the prospect of benefit to the other creditors. The record here does not, so the Motion cannot be granted.

---

[3] Under similar questioning from counsel for PeoplesBank and counsel for Bell Power, Shane Anderson, as Vice President of Operations for both GVM and IAE, offered similar testimony. Hr'g Tr. 173:19–23; 190:23–191:2.

## IV. Conclusion

This court concludes that although § 105(a) is a powerful and versatile tool, it must operate solely within the context of the Code, which defines its powers and circumscribes its limitations. While it may be used to fashion orders as necessary to further substantive provisions of the Code, it may not be used to create substantive rights that are otherwise unavailable under the Code as is the case here. Regarding § 364(b), this court concludes that the plain language of this section merely authorizes the debtor to obtain credit and does not contain any language regarding how money is disbursed or priorities among creditors. Finally, this court need not decide whether § 363(b)(1) contains a grant of authority for debtors to prefer some vendors over others as proposed here because the relief requested here is not supported by the record in any event. The testimony offered by the President and Owner of the Debtors, as well as the Vice President of Operations for the Debtors not only failed to establish that the critical vendors would not do business with the Debtors post-petition unless their prepetition claims were paid, it proved that they would. Additionally, the Debtors also failed to establish that the disfavored creditors will be at least as well off as they will be if the Motion is denied. Even if § 363(b)(1) allows critical vendors orders in principle, preferential payments to a class of creditors are proper only if the record shows the prospect of benefit to the other creditors. The record here does not. The Motion is therefore denied.

An appropriate order will follow.

Dated: September 6, 2019

By the Court,

_Henry W. Van Eck_ (JH)
Henry W. Van Eck, Bankruptcy Judge

12