**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVAIA**

| | | |
|---|---|---|
| In re: | : | Case No. 1:19-bk-03013-HWV |
| | : | |
| GVM, Inc., et al., | : | CHAPTER 11 |
| | : | Jointly Administered with |
| Debtor. | : | Case No. 1:19-bk-03014-HWV |
| | : | Case No. 1:19-bk-03015-HWV |
| | : | |
| GVM, Inc. and Independent | : | |
| AG Equipment, Inc., | : | |
| | : | Motion for Use of |
| v. | : | Cash Collateral |
| | : | 11 U.S.C. §363 |
| PeoplesBank, A Codorus | : | |
| Valley Company, | : | |
| | : | |
| Respondent | : | |

## OPINION

This matter came before the Court for hearing on August 8, 2019 (the "Hearing") regarding the Emergency Motion of GVM, Inc. ("GVM") and Independent AG Equipment, Inc. ("IAE") for an Order Pursuant to 11 U.S.C. § 363 To: (I) Permit Use of Cash Collateral and Provide Adequate Protection to Parties with Interest in Cash Collateral, (II) Request for Expedited Hearing, Reduced Notice Period and Limited Notice Pursuant to Federal Rule of Bankruptcy Procedure 9006(C)(1) and M.D. Pa. L.B.R. 9075-1(A) and (III) For Related Relief (the "Motion"), and the Objections filed thereto by PeoplesBank, a Codorus Valley Company (the "Bank") and Moneycorp US, Inc. ("Moneycorp") in the above-referenced bankruptcy cases. In the Motion, GVM and IAE (collectively, the "Debtors") seek entry of an order authorizing them to use cash collateral during the pendency of these cases to avoid immediate and irreparable harm to the estates and to continue their business operations with the objective of formulating effective plans of reorganization.

1

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. Facts and Procedural History

GVM is a family-owned business operating as a manufacturer and distributor of agricultural equipment and supplies throughout the eastern United States. GVM primarily manufactures heavy agricultural equipment used for spreading and spraying liquid or dry fertilizers and pesticides. It also manufactures equipment used for applying anti-icing treatment to roads, which makes use of technology similar to its agricultural spreaders and sprayers. IAE is a distributor and servicer of new and used agricultural equipment and accessories. GVM sells its products through IAE and also through third-party distributors. IAE sells products manufactured by both GVM and by third-party original equipment manufacturers. The Debtors each filed a voluntary petition for reorganization under chapter 11 of Title 11, U.S.C. § 101 et seq. (the "Code") on July 13, 2019 (the "Petition Date"). By Order of this court entered on August 13, 2019, these cases are being jointly administered for the convenience of the parties.

### A. The Bank Loans

The Bank has three outstanding loans to GVM (the "GVM Loans") and one outstanding loan to IAE.

### 1. Bank Loans to GVM

The GVM Loans consist of a line of credit that revolved until the Chapter 11 filings (the "GVM LOC"), a term loan (the "GVM Term Loan"), and a term-out loan (the "GVM TO Loan"). Bank's Statement in Supp. of Objs. 2–3, ECF No. 120 ("Bank Closing Statement"); Bank Exs. 15,

2

21, 27, 30, 32, 33. Each of these loans to GVM were made pursuant to an Amended and Restated Loan and Security Agreement made as of August 6, 2018, as amended over time (the "GVM Loan Agreement"). Bank Exs. 15, 27, 30, 32, 33. According to the testimony of the Bank's Chief Credit Officer, Dennis Ginder, the balance outstanding on the GVM LOC as of August 8, 2019 was $3,147,810.64. Hr'g Tr. 209:1. Mr. Ginder also testified that the balances outstanding on the GVM Term Loan and the GVM TO Loan as of August 8, 2019 were $311,624.27 and $333,262.60, respectively. Hr'g Tr. 209:6; 210:23. The total amount owed by GVM to the Bank in connection with the GVM Loans is therefore $3,792,697.51. GVM unconditionally guaranteed all of IAE's obligations to the Bank. Bank Exs. 2, 3.

### 2. **Bank Loans to IAE**

The Bank has one outstanding loan to IAE, which was also a revolving line of credit until the Chapter 11 filings (the "IAE LOC"). Bank Closing Statement 2; Bank Exs. 1, 5, 7, 11, 13. The IAE LOC was made pursuant to an Amended and Restated Loan and Security Agreement made as of August 6, 2018, as amended over time (the "IAE Loan Agreement"). Bank Exs. 5, 7, 11, 13. The balance outstanding on the IAE LOC as of August 8, 2019, according to the testimony of Mr. Ginder, was $8,221,293.99, exclusive of fees and expenses. Hr'g Tr. 211:3. IAE unconditionally guaranteed all of GVM's obligations to the Bank. Bank Exs. 19, 20.

Based upon the evidence of record, GVM and IAE collectively owe the Bank $12,013,991.50 in connection with the GVM Loans and the IAE LOC.

### B. **The Collateral**

All obligations of GVM and IAE to the Bank, either as borrower or guarantor, are secured by security interests in substantially all of the Debtors' assets including, among other things, accounts receivable, inventory consisting of wholegoods inventory and parts inventory,

equipment, general intangibles, and proceeds (collectively, the "Article 9 Collateral"), to secure all of their obligations to the Bank, both direct and indirect.[1] Bank Closing Statement 3; *see* Bank Ex. 1, §§ 1.14, 1.57, 3.1, 3.2. The Bank perfected its security interests against the Article 9 Collateral in connection with the IAE LOC on August 21, 2012 by filing financing statements with the Pennsylvania Secretary of State, which were renewed by UCC filing dated July 11, 2017. Bank Exs. 38, 39. The Bank also perfected its security interests against the Article 9 Collateral in connection with the GVM Loans on August 21, 2012 by filing financing statements with the Pennsylvania Secretary of State, which were renewed by UCC filing dated June 14, 2017. Bank Exs. 40, 41.

The obligations of GVM and IAE to the Bank are also secured by mortgages on real property owned by an affiliate, GVM West, Ltd. ("West"), which has filed its own Chapter 11 petition, and real property owned by other affiliates, Anderson Real Estate, LLC ("ARELLC"), Mark Anderson and Tracy Anderson (the "Andersons" and collectively with ARELLC, the "Affiliates"), who have not sought relief under the Bankruptcy Code to date. *See* Bank Closing Statement 5; Bank Ex. 1, § 1.61; Bank Ex 15, § 1.63. The real property owned by West is hereinafter referred to as the "West Real Property" and all real property owned by the Affiliates is hereinafter collectively referred to as the "Affiliates Real Property."

In addition to the foregoing, GVM also pledged to the Bank 10,350,079 shares of stock in AgJunction, Inc. ("AgJunction"), and any shares of stock in AgJunction GVM subsequently acquires, as security for the GVM Loans and its guaranty of the IAE LOC (the "Pledged Shares").

---

[1] According to GVM's Schedules, the cash held by the Debtors is in a depository account with First National Bank ("FNB"). No control agreement between GVM, the Bank, and FNB granting the Bank control over the FNB account was presented to the court. Therefore, to the extent the Bank asserts a secured interest in the Debtors' cash, such interest appears to be unperfected, though the court makes no such finding at this stage of the proceedings. Further, the court notes that even if it is later established that the Bank has a perfected interest in the Debtors' cash, such a finding would not change the outcome of the analysis that follows.

Bank Ex. 22. The Pledged Shares included 2,723,705 shares of AgJunction stock pledged by GVM to Jack Anderson (the "Anderson Pledge"). *See* Bank Closing Statement 5; Bank Ex. 22, § 1.11. The Bank subordinated its position regarding the Anderson Pledge to Jack Anderson in a Subordination and Intercreditor Agreement made as of September 23, 2015. Bank Ex. 23. The Article 9 Collateral, West Real Property, Affiliates Real Property, and the Pledged Shares are hereinafter referred to collectively as the "Collateral."

### C.   The Collateral Value

### 1.   GVM

According to the Bank, GVM had accounts receivable totaling $258,825.16[2] (the "GVM Accounts Receivable") and inventory[3] valued at $7,844,225.92[4] (the "GVM Inventory" and collectively with the GVM Accounts Receivable, the "GVM Cash Collateral") as of August 8, 2019. *See* Bank Closing Statement 6; Debtors Ex. 1. The Bank calculated the book value of GVM's equipment, as of May 31, 2019, to be $246,902.00 (the "GVM Equipment"), net of the amount estimated by the Bank to pay off claims secured by liens against the GVM Equipment that may be senior in priority to the Bank.[5] *See* Bank Closing Statement 6. The Debtors valued the Pledged Shares at approximately $4 million. Hr'g Tr. 34:17–23. According to the Bank, however, and based in part upon information from a financial statement internally prepared by GVM, the value of the Pledged Shares net the Anderson Pledge is only $2,948,000.00. Bank Closing Statement 8. The aggregate net value of the GVM Cash Collateral, the GVM Equipment, and the Pledged Shares is therefore $11,297,953.08.

---

[2] Excludes receivables due from IAE and accounts more than 90 days old.
[3] Includes both wholesale inventory and parts inventory.
[4] Net a markdown reserve on the parts inventory as per the GVM Loan Agreement.
[5] This estimate is also net of depreciation and excluding the AgJunction stock and GVM's equity interest in IAE.

5

### 2. **IAE**

According to the Bank, IAE had accounts receivable totaling $1,599,016.75[6] (the "IAE Accounts Receivable") and inventory[7] valued at $10,837,787.30[8] (the "IAE Inventory" and collectively with the IAE Accounts Receivable, the "IAE Cash Collateral") as of August 5, 2019. *See* Bank Closing Statement 7; Debtors Ex. 1. The Bank calculated the book value of IAE's equipment, as of May 31, 2019, to be $347,395.02 (the "IAE Equipment"), net of the amount estimated by the Bank to pay off claims secured by liens against the IAE Equipment that may be senior in priority to the Bank. *See* Bank Closing Statement 7. The combined net value of the IAE Cash Collateral and the IAE Equipment is therefore $12,784,199.07.

### 3. **GVM West, Ltd. and the Affiliates**

Testimony was provided by the Debtors' President and Owner, Mark Anderson, indicating that the value of the West Real Property, against which the Bank holds a first priority mortgage, is approximately $1,000,000.00.[9] The Bank did not dispute this value. No evidence regarding the value of the Affiliates Real Property was offered at the Hearing.

The GVM Cash Collateral and the IAE Cash Collateral may hereinafter be collectively referred to as the "Cash Collateral." The Cash Collateral, the GVM Equipment, the IAE Equipment, the Pledged Shares, the West Real Property and the Affiliates Real Property may hereinafter be referred to as the "Collateral."

### D. **The Debtors' Offer**

It is undisputed that, except as noted above, the Bank has a first priority perfected lien against the Collateral, including the Cash Collateral. According to the Motion, the Debtors require

---

[6] Excludes accounts more than 90 days old.
[7] Includes both wholesale inventory and parts inventory.
[8] Net a markdown reserve on the parts inventory as per the IAE Loan Agreement.
[9] Additional testimony was provided by Shane Anderson, the Debtors' Vice President of Operations.

use of the Cash Collateral to continue operating their businesses. They claim the evidence presented at the Hearing demonstrates an apparent need for use of the Cash Collateral as without cash, the Debtors will cease operating. The Debtors further claim that the budget they presented at the Hearing details how use of the Cash Collateral will benefit the estate and preserve its value. Debtors Ex. 6. They claim the offer of adequate protection is more than sufficient to protect the value of the Bank's interest in the Cash Collateral during the pendency of this case. As adequate protection, the Debtors' offer: (1) weekly payments in the aggregate amount of $25,500 ($14,500 from GVM and $11,000 from IAE); (2) a substantial equity cushion; (3) increasing collateral values; and (4) a replacement lien on all Collateral, including on Cash Collateral, and maintenance of value through operation of their businesses. The Debtors thus ask this court to approve their use of Cash Collateral as they move forward with reorganization.

E.   **The Objections**

The Bank has objected to the Motion (the "Bank Objection") asserting that the Debtors' financial condition is such that they are incapable of a successful reorganization even if the Motion is granted, and that granting the Motion will simply result in the depletion of the Bank's collateral base until the inevitable failure of both GVM and IAE. The Bank also argues that the Debtors cannot be trusted with use of the Cash Collateral based upon their prepetition activities. Therefore, the Motion should be denied.

Moneycorp, which does not claim to possess a lien against the Cash Collateral, objects to the relief requested in the Motion because the projected 13-week budgets attached to the Motion are lacking in sufficient detail and do not account for certain post-petition transfers that the Debtors directed Moneycorp to make on the eve of filing their voluntary chapter 11 petitions. Moneycorp submits that this Court should not reward what amounts to the Debtors' inappropriate post-petition

conduct which has caused significant damage to Moneycorp by granting the Debtors authorization to use the Cash Collateral.

The questions thus presented to this court include: (1) whether the Debtors are engaged in an obviously futile attempt to reorganize and should not therefore be permitted to jeopardize the Bank's Cash Collateral; (2) whether the Debtors offer of adequate protection is sufficient to protect the value of the Bank's interest in the Cash Collateral during its projected term of use by the Debtors; and, if so (3) whether the Motion nevertheless should be denied under the doctrine of "unclean hands" based upon the Debtors' actions as they relate to Moneycorp and the Bank.

### III. Discussion

### A. Prospects for Reorganization

The first issue presented is whether there is any realistic prospect of reorganization for these Debtors. The Bank argues that in addition to reviewing the Debtors' adequate protection proposal, the court should consider whether there is any reasonable chance of reorganization. If a debtor is engaged in an obviously futile attempt to reorganize, it should not be permitted to jeopardize a creditor's cash collateral. *In re Hari Ram, Inc.*, 507 B.R. 114, 125 (Bankr. M.D. Pa. 2014) (citing *In re C.F. Simonin's Sons, Inc.,* 28 B.R. 707, 711 (Bankr.E.D.N.C.1983); *Sharon Steel Corp. v. Citibank, N.A.,* 159 B.R. 165, 172 (Bankr.W.D.Pa.1993) (holding that debtor could not use cash collateral although objecting creditors were oversecured when business plan was unrealistic and unattainable). The cases relied upon by the Bank, however, are distinguishable from the present case and therefore do not support the Bank's position here.

The debtor in *Hari Ram*, for example, sought permission to use hotel room revenues as cash collateral. The cash collateral was subject to a perfected security interest in favor of a creditor, who did not consent to the debtor's use of same. The debtor filed a motion pursuant to § 363(c)(2)

for use of the cash collateral and offered the creditor a replacement lien against post-petition hotel room revenues as adequate protection. The court in *Hari Ram* denied the debtor's motion, finding that the creditor already possessed a continuing security interest in the hotel room revenues under § 552(b)(2) and that the offer of a replacement lien was therefore illusory. "Unlike other forms of cash collateral, a prepetition security interest in hotel room revenues continues to attach to post petition revenues. [] Under these circumstances, the offer of a replacement lien on the post-petition rents is meaningless because the creditor already has a lien on these assets." *Id*. at 125 (citations omitted). In the absence of the ability to offer adequate protection to the creditor for the use of the cash collateral, the court in *Hari Ram* concluded that the debtor had failed to sustain its burden for the use of same and that any attempt to reorganize was therefore futile.

The present case is distinguishable from *Hari Ram* because the Cash Collateral here is comprised of traditional accounts receivable and proceeds from the sale of inventory rather than hotel room revenues. Unlike hotel room revenues, a prepetition security interest in inventory and accounts receivable does not attach to post-petition inventory and accounts receivable. 11 U.S.C. § 552(a).[10] Under these circumstances, the Debtors' offer of a replacement lien on the post-petition accounts receivable and inventory in this case is meaningful because the Bank is otherwise not entitled to a lien on these assets. Because the Debtors here, unlike the debtor in *Hari Ram*, possess the ability to offer adequate protection to the Bank for the use of the Cash Collateral, the court in this case cannot conclude on these grounds that the Debtors are unable to sustain their burden for the use of same and that any attempt to reorganize is therefore futile. *Hari Ram* is thus

---

[10] Section 552(a) provides: "Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

distinguishable from the present case and the decision offers no support for the Bank's argument here.[11]

The case of *In re C.R. Simonin's Sons, Inc.*, 28 B.R. 707 (Bankr. E.D.N.C. 1983) likewise fails to support the Bank's argument that the Debtors have no realistic chance of reorganization. Indeed, a fair reading of that case demonstrates that it actually supports a finding that it is inappropriate to make such a finding at this stage of these proceedings. The facts of *C.R. Simonin's Sons*, which are strikingly similar to the facts at hand, describe a debtor with accelerating losses over a period of eight years leading up to the filing of a voluntary chapter 11 petition. The debtor promptly sought permission to use its cash, accounts receivable, and inventory for its continued operations. The cash, accounts receivable, and inventory were each subject to a perfected security interest in favor of a bank, who did not consent to the debtor's use of same. The debtor in *C.R. Simonin's Sons* filed a motion pursuant to § 363(c)(2) for use of the cash collateral and offered the creditor a replacement lien against post-petition cash, accounts receivable, and inventory as adequate protection. The bank objected and argued that based on the debtor's performance over the past eight years there was no realistic chance of rehabilitation. The bank also argued that since there was only one other independent manufacturer of the product manufactured by the debtor in in the region, chances of a sale of the business as a going concern were remote.

The debtor in *C.R. Simonin's Sons* responded by asserting that the business could be profitable and pointed to lower interest rates, lower fuel costs, renegotiation of a union contract, rejection of unprofitable long-term contracts, better production scheduling, the proposed purchase of more efficient equipment, and personnel cutbacks. The debtor, however, offered no specific

---

[11] *Hari Ram* is further distinguishable from the present case in at least one other significant way. The creditor in that case was significantly under-secured on at least two of its claims which stands in stark contrast to the Bank here, which is significantly oversecured on each of its claims.

projections to illustrate future profitability. In fact, the best the company's chief executive officer could predict was that the company would be "operating at a breakeven basis in six months." *C.F. Simonin's Sons*, 28 B.R. at 711.

After considering the evidence, the bankruptcy court in *C.F. Simonin's Sons* observed that it was clear "that the [d]ebtor's chance of successful reorganization is highly speculative. Almost all chapter 11 cases, however, involve an element of risk." *C.F. Simonin's Sons*, 28 B.R. at 712. Consistent with that observation, the court in *C.F. Simonin's Sons* held that it was "too early in [the] case to conclude that there is no prospect of reorganization." *Id*. at 711. In so holding, the bankruptcy court noted that although the debtor "had offered no projections to indicate how the business can be rehabilitated . . . specific details of a debtor's reorganization are not required at the earliest stages of a chapter 11 case." *Id*. Instead, the bankruptcy court opined that "[a]s the case progresses, the [d]ebtor will have a stricter burden to prove that there exists a reasonable chance of success. For now, the [d]ebtor's broad outline of decreased costs and prospects of sale are sufficient." *Id*.

Just like the bank in *C.F. Simonin's Sons*, the Bank here argues that based upon the Debtors' performance over the past three years, there is no realistic chance of rehabilitation. The Bank also argues that since the Debtors' prepetition efforts to secure take-out financing were unsuccessful, the chances of a refinance or a sale of the business as a going concern in this case are remote. Just like the debtors in *C.F. Simonin's Sons*, the Debtors here maintain that the businesses can be profitable and they point to several steps the Debtors have taken over the past one to two years which they believe, in combination with an improving outlook for the agricultural machinery industry in general, have created a substantial growth opportunity heading into 2019. The Debtors believe their current trajectory has them on a clear path to improved profitability

moving forward.  Importantly, and unlike the debtor in *C.F. Simonin's Sons*, the Debtors here have provided specific projections to illustrate future profitability.  As is always the case in chapter 11 proceedings, whether those projections will ultimately prove accurate remains to be seen.  However, the court notes that the President and owner of the Debtors in this case provided competent testimony that those projections were based upon present and historical data.  Hr'g Tr. 41:16–42:3.  This stands in stark contrast to the chief executive officer's prediction in *C.F. Simonin's Sons* that the debtor would be "operating at a breakeven basis in six months."  While it may be true that the Debtors' prospects for a successful reorganization in this case are speculative, they are no more so than the debtor in *C.F. Simonin's Sons* or most other chapter 11 cases.  Indeed, the evidence presented here compels a finding that they are perhaps less speculative than most chapter 11 cases, and certainly less speculative then those in *C.F. Simonin's Sons*.

Based upon the foregoing, the court concludes that it is simply too early in this case to conclude that there is no prospect of reorganization.  Precise details of the Debtors' reorganization are not required at this early stage to overcome the Bank's concern here.  In this context, it is enough that the Debtors have offered sufficient and competent projections based upon unchallenged historical data to indicate how the businesses could be rehabilitated.  It is true that as the case progresses, the Debtors will have a stricter burden to prove that there exists a reasonable chance of success.[12]  For now, the Debtors' broad outline and projections of decreased costs and increasing revenue, an improving outlook for the agricultural machinery industry in general, and prospects of take-out financing or a sale are sufficient.

---

[12] Failure to adhere to their own projections, for example, could result in increased scrutiny of their ability to reorganize as they have outlined here.

## B.     Use of Cash Collateral

Under § 363(c)(2), a debtor may not use cash collateral unless consent is obtained from creditors that have an interest in the collateral, or the bankruptcy court authorizes its use. If the creditor does not consent, cash collateral may be used by the debtor only to the extent that the court determines that the creditor's interest in the collateral is adequately protected. 11 U.S.C. § 363(e). "Cash collateral" includes cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property. 11 U.S.C. §363(a).

Adequate protection is not defined in the Code, but § 361 provides three non-exclusive methods as examples of same: (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the indubitable equivalent of the secured creditor's interest. 11 U.S.C. § 361. "When devising a proposal for adequate protection of a secured creditor's interest, the proponent 'should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.'" *In re Hari Ram, Inc.*, 507 B.R. 114, 120 (Bankr. M.D. Pa. 2014) (quoting *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir. 1984), (quoting *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994))). The burden of proof is on the debtor to demonstrate that the secured creditor is adequately protected for the purpose of using its cash collateral. *Hari Ram*, 507 B.R. at 120; § 363(p)(1).

A bankruptcy court should apply the following standard when determining whether a debtor should be permitted to use cash collateral:  (1) The court must establish the value of the secured creditor's interest; (2) The court must identify risk to the secured creditor's value resulting from the debtor's request for use of cash collateral; and (3) The court must determine whether the

debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence. *Hari Ram*, 507 B.R. at 125 (citing *Martin v. United States (In re Martin)*, 761 F.2d 472, 476–77 (8th Cir. 1985).

### 1. Establishing the Value of the Bank's Interest

The first step of the adequate protection standard requires the court to determine the "value of the secured creditor's interest." *See Hari Ram*, 507 B.R. at 125. That value is nothing more than the "interest of an entity in property." 11 U.S.C. § 361; *see In re Aegean Fare, Inc.*, 33 B.R. 745 (Bankr. D. Mass. 1983), order modified on other grounds, 34 B.R. 965 (Bankr. D. Mass. 1983). The "interest of an entity in property," in turn, is not measured by the amount of the claim but is instead measured by the value of the protected entity's interest in the property involved. *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982); *Aegean Fare,* 33 B.R. at 745. Regarding secured creditors, adequate protection is therefore intended to protect only that portion of the secured creditor's claim that is secured and not the portion that is unsecured. *In re Philadelphia Consumer Discount Co.*, 37 B.R. 946 (E.D. Pa. 1984).[13] These well-established principles make it clear that the right to adequate protection is limited to the lesser of the value of an entity's interest in collateral or the amount of the entity's claim. *See In re Aegean Fare, Inc.*, 33 B.R. at 745.

Although the Collateral has not been formally valued, both the Debtors and the Bank have offered estimates of value as described above. These estimates represent the only competent evidence of record regarding the value of the Collateral. It is therefore appropriate to use these estimates for the purpose of evaluating the Debtors' adequate protection offer. When these

---

[13] The Code provides that secured property must be valued and that a claim is secured only to the extent of such value. *See* 11 USC § 506 (a).

estimates and the above principles are applied, the value of the Bank's interest in the Collateral is easily calculated.

### a.     <u>GVM</u>

Recall that the GVM Accounts Receivable and proceeds from the sale of the GVM Inventory each serve as cash collateral for the GVM Loans.[14] According to the Bank, the balance due on the GVM Loans as of August 8, 2019 was $3,792,697.51. The combined value of the GVM Cash Collateral as of August 8, 2019 was $8,103,051.08. Since the value of the Bank's interest in the GVM Cash Collateral is limited to the lesser of the value of its collateral or the amount of its claim, and the amount of the Bank's claim in connection with the GVM Loans is less than the value of the GVM Cash Collateral, the value of the Bank's interest in the GVM Cash Collateral is $3,792,697.51. This is the value of the Bank's interest in the GVM Cash Collateral that may be entitled to protection under the first element of the standard set forth in *Hari Ram*.

### b.     <u>IAE</u>

Likewise, recall that the IAE Accounts Receivable and proceeds from the sale of the IAE Inventory each serve as cash collateral for the IAE LOC. According to the Bank, the balance due on the IAE LOC as of August 8, 2019 was $8,221,293.99. The combined value of the IAE Cash Collateral as of August 5, 2019 was $12,436,804.05. Since the value of the Bank's interest in the IAE Cash Collateral is limited to the lesser of the value of its collateral or the amount of its claim, and the amount of the Bank's claim in connection with the IAE LOC is less than the value of the IAE Cash Collateral, the value of the Bank's interest in the IAE Cash Collateral is $8,221,293.99.

---

[14] The priority order of the liens against the Cash Collateral in connection with the GVM LOC, the GVM Term Loan, and the GVM TO Loan was not established at the Hearing. However, since the GVM Accounts Receivable and the proceeds from the sale of GVM Inventory each serve as collateral for each of the GVM Loans, and because it ultimately will not affect the outcome of this analysis due to the significant equity cushion in this case, the court will treat the GVM Loans as one for purposes of this examination.

This is the value of the Bank's interest in the IAE Cash Collateral that may be entitled to protection under the first element of the standard set forth in *Hari Ram*.

### 2. <u>Establishing the Risk to the Value of the Interest</u>

Next, the court is required to identify the "risk" to the value of the Bank's interest resulting from the Debtors' use of the Cash Collateral. *See Hari Ram*, 507 B.R. at 125. This element requires the Court to determine, among other things, whether the value of the Cash Collateral will diminish through the Debtors' use of same or if the Bank is over-secured.

It is well established that an interest in property may be deemed to be adequately protected where the property is not depreciating. *See In re Weinstein*, 227 B.R. 284 (B.A.P. 9th Cir. 1998); *see also In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982); *In re Orlando Trout Creek Ranch*, 80 B.R. 190 (Bankr. N.D. Cal. 1987). It is equally clear that when assessing the risk to a secured creditor's interest in collateral, most courts engage in an analysis of the property's equity cushion, which is the value of the property after deducting the claim of the creditor and all senior claims. *See In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (citations omitted). An equity cushion is the surplus of value remaining after the amount of indebtedness is subtracted from the fair market value of the property securing same. *Com. Of Pennsylvania State Emp. Retirement Fund v. Roane*, 14 B.R. 542 (E.D. Pa. 1981). The amount of encumbrances junior to that of the secured creditor in question should not be considered. *In re Nashua Trust, Co.*, 73 B.R. 423 (Bankr. D.N.J. 1987); *see In re James Wilson Assoc.*, 965 F.2d 160, 171 (7th Cir. 1992); *In re Marko Gurnee P'ship.*, 252 B.R. 712, 716–17 (Bankr. N.D.Ill 1997).

When these principles are applied to the case at hand, identifying the risk to the value of the Bank's interests in the Cash Collateral is easily accomplished.

16

### a.     **The GVM Risk**

As set forth above, the value of the Bank's interest in the GVM Cash Collateral as of the Petition Date was $3,792,697.51. Calculating the Bank's risk typically involves comparing this value to an estimated value of the Bank's interest in the Cash Collateral at the end of the Debtors' requested term of use. However, no such estimate of value was provided in this case. Because of this, the court estimates the value of the Bank's interest in the GVM Cash Collateral at the end of the Debtors' requested term of use to be $0.00.[15] Since the value of the Bank's interest in the GVM Cash Collateral at the end of the projected term of use is $3,792,697.51 less than the value of the Bank's interest in the GVM Cash Collateral as of the Petition Date, the risk to the value of the Bank's interest in the GVM Cash Collateral resulting from GVM's use of same during this bankruptcy proceeding is $3,792,697.51 (the "GVM Risk").

However, the total value of the Collateral securing the GVM Loans as of the Petition Date was $11,297,953.08.[16] Bank Closing Statement 8. Thus, there is a surplus of $7,505,255.57 remaining after the balance due on the GVM Loans is subtracted from the total value of the GVM Collateral and the Agjunction Stock, net of the Anderson Collateral. This surplus represents an initial equity cushion that existed at the commencement of this case. Since the value of this initial equity cushion as of the commencement of this case is greater than the value of the GVM Risk, an equity cushion of $3,712,558.06 in favor of the Bank will exist at the end of the requested term of use (the "GVM Final Equity Cushion"). Unless applied elsewhere, the GVM Final Equity Cushion could entirely off-set the GVM Risk.

---

[15] Accounts receivable are generally collected or otherwise deemed uncollectable within 90 to 120 days. Wholegoods inventory may also be entirely sold during that time, though no evidence suggesting this was presented at the Hearing. A full turnover of parts inventory usually takes longer as parts must first be transformed into wholegoods before they are sold. Again, however, no evidence suggesting how long it would take to sell the parts inventory was presented at the Hearing. Because of this, the court must assume that the entire value of the Bank's interest is at risk during the pendency of this case.

[16] Not including the West Real Property, the Affiliates Real Property or any of the IAE Collateral.

### b.     __The IAE Risk__

The IAE Accounts Receivable and proceeds from the sale of the IAE Inventory each serve as cash collateral for the IAE LOC. As set forth above, the value of the Bank's interest in the IAE Cash Collateral as of the Petition Date was $8,221,293.99. Calculating the Bank's risk typically involves comparing this value to an estimated value of the Bank's interest in the Cash Collateral at the end of the Debtors' requested term of use. However, no such estimate of value was provided in this case. Therefore, the court estimates this value to be $0.00.[17] Since the value of the Bank's interest in the IAE Cash Collateral at the end of the projected term of use is $8,221,293.99 less than the value of the Bank's interest in the IAE Cash Collateral as of the Petition Date, the risk to the value of the Bank's interest in the IAE Cash Collateral resulting from IAE's use of same during this bankruptcy proceeding is $8,221,293.99 (the "IAE Risk").

However, the total value of the collateral securing the IAE LOC as of the Petition Date was $13,784,199.07.[18] Thus, an initial equity cushion of $5,562,905.08 existed as of the commencement of this case. This initial equity cushion mitigates the IAE Risk, though not entirely. Since the initial equity cushion of $5,562,905.08 is less than the IAE Risk of $8,221,293.99, a deficit of $2,658,388,91 is projected to exist at the end of the requested term of use (the "IAE Deficit"). The IAE Deficit, however, is mitigated further by the GVM Final Equity Cushion. Recall that GVM unconditionally guaranteed the IAE LOC and that the GVM Collateral, including the Pledged Stock, also serves as collateral for the IAE LOC. Since the IAE Deficit of $2,658,388,91 is less than the value of the GVM Final Equity Cushion of $3,712,558.06, an equity cushion of $1,054,169.15 in favor of the Bank will exist at the end of the requested term of use

---

[17] *See supra* fn. 15.
[18] This value includes the IAE Cash Collateral, IAE Equipment, and the West Real Property.

(the "Final Equity Cushion"). This Final Equity Cushion may entirely off-set both the IAE Risk and the GVM Risk.

### 3. Evaluating the Debtors' Offer

The third element of the standard for adequate protection requires the court to determine whether the Debtors' proposal will protect the Bank's interest as nearly as possible against the identified risks consistent with the concept of indubitable equivalence. *See Hari Ram*, 507 B.R. at 125. The general concept of adequate protection as defined by the indubitable equivalence is to require such relief as will result in the realization of value. **H. Rept. No. 95-595, p. 340.** Moreover, the realization of value as adequate protection in the reorganization context does not have to occur at once, but only upon completion of the reorganization. *United Sav. Ass'n of Texas v Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 377 (1988).

Having established the value of the Bank's interest relative to the GVM and IAE Cash Collateral, and after identifying the risks to those values resulting from the Debtors' continued use of same, it is now possible to determine whether the Debtors adequate protection proposal protects the Bank's interests as nearly as possible against the identified risks.

### a. The GVM Offer

As established above, the GVM Cash Collateral serves as collateral for the GVM Loans. The value of the Bank's interest in the GVM Cash Collateral as of the commencement of this case was $3,792,697.51. The risk to the value of that interest resulting from GVM's use of the GVM Cash Collateral during this bankruptcy case is also $3,792,697.51. However, the Bank enjoys the GVM Final Equity Cushion of $3,712,558.06 relative to the GVM Loans. This entirely off-sets the risk to the value of the Bank's interest in the GVM Cash Collateral through GVM's use of

Case 1:19-bk-03014-HWV    Doc 102    Filed 09/06/19    Entered 09/06/19 11:40:21    Desc
Main Document    Page 19 of 25

same. Therefore, GVM's adequate protection proposal protects the value of the Bank's interest in the GVM Cash Collateral as nearly as possible against the risks to that value.

Notwithstanding the foregoing, GVM's proposal also provides adequate protection in the form of a replacement lien against all post-petition accounts receivable and inventory[19] acquired by GVM (the "GVM Replacement Lien"). Though GVM did not provide the court with an estimated value of these post-petition accounts receivable and inventory, it did provide some evidence that their value is increasing slightly, or at least holding steady at prepetition values.

Consideration of the Debtors' recent prepetition borrowing base certificates demonstrates a trend of increasing Cash Collateral value over a one-month period. *See* Debtors Exs. 1–5; *see also* Debtors Exs. 8, 9. Though this sampling period is uncomfortably small, it is timely as it begins on July 7, 2019 and ends on August 5, 2019. This recent trend of increasing Cash Collateral value is also acknowledged by the Bank in its Statement in Lieu of Closing Argument wherein the Bank recognized that the "Debtors' aggregate assets, excluding the Agjunction stock, did increase between December 31, 2018 and May 31, 2019 according to a comparison of Debtors' Exhibit 8C to Debtors' Exhibit 9. However, the increase is only $399,981.93." Bank Closing Statement 11. In consideration of the foregoing, the court finds the evidence presented by GVM both competent and reasonably supportive of their claim that the value of the post-petition GVM accounts receivable and GVM inventory will at least maintain their prepetition value of $3,792,697.51 during the course of this proceeding.

Having established the value of GVM's Replacement Lien, the court now returns to its examination of GVM's offer. As identified above, the risk to the value of the Bank's interest in the GVM Cash Collateral is $3,792,697.51. To protect against this risk, and in addition to the

---

[19] Including both wholegoods inventory and parts inventory.

GVM Final Equity Cushion, GVM is offering the Bank the GVM Replacement Lien having a projected value of $3,792,697.51. Because the value of the GVM Replacement Lien is equal to the Bank's anticipated risk to the GVM Cash Collateral resulting from GVM's use of same, the GVM Replacement Lien is sufficient to provide the Bank with adequate protection for GVM's use of the GVM Cash Collateral.

Even though the risk to the value of the Bank's interest in the GVM Cash Collateral is adequately protected by the GVM Final Equity Cushion and the GVM Replacement Lien, GVM is also offering a periodic (weekly) cash payment to the Bank in the amount of $14,500.00 (the "GVM Weekly Payment"). According to the testimony of the President and owner of each Debtor, this weekly payment represents a full interest payment due to the Bank in connection with the GVM Loans. Hr'g Tr. 70:9–71:11. Though the GVM Weekly Payment does not reduce the principal balance due by GVM in connection with the GVM Loans, it does prevent the accrual of additional interest during the course of this proceeding thereby maintaining the status quo, which is a primary goal of adequate protection. In this sense, the GVM Weekly Payment must be considered a critical component of GVM's adequate protection offer.

In view of all the foregoing, this court concludes that GVM's offer of adequate protection is sufficient to protect the value of the Bank's interest in the GVM Cash Collateral during this proceeding. Indeed, the GVM Final Equity Cushion may alone be enough to do so. However, any doubt as to the adequacy of GVM's offer is removed given the value of the GVM Replacement Lien. Finally, it is often not enough to have an equity cushion supported by a replacement lien in most chapter 11 cases to justify the use of cash collateral. Cash flow is a critical component of any reorganization. GVM's ability to make regular periodic payments to the Bank in an amount

sufficient to maintain the status quo is a vital component of GVM's offer, which this court finds sufficient.

### b.     <u>The IAE Offer</u>

As established above, the IAE Cash Collateral serves as collateral for the IAE LOC. The value of the Bank's interest in the IAE Cash Collateral as of the commencement of this case was $8,221,293.99. The risk to the value of that interest resulting from IAE's use of the IAE Cash Collateral during this bankruptcy case is also $8,221,293.99. However, the Bank enjoys a Final Equity Cushion of $1,054,169.15 in connection with the IAE LOC. This Final Equity Cushion entirely off-sets the risk to the value of the Bank's interest in the IAE Cash Collateral through IAE's use of same. Therefore, IAE's adequate protection proposal protects the value of the Bank's interest in the IAE Cash Collateral as nearly as possible against the risks to that value.

Notwithstanding the foregoing, IAE's proposal also provides adequate protection in the form of a replacement lien against all post-petition accounts receivable and inventory[20] acquired by IAE (the "IAE Replacement Lien"). Though IAE did not provide the court with an estimated value of these post-petition accounts receivable and inventory, it did provide evidence similar to that of GVM establishing that their value is either slightly increasing, or at least holding steady at prepetition values. *See* Debtors Exs. 1–5; *see also* Debtors Exs. 8, 9. This court finds the evidence presented by IAE to be competent and reasonably supportive of their claim that the value of the post-petition IAE accounts receivable and IAE inventory will at least maintain their prepetition value of $12,436,804.05 during this proceeding.

Having established the value of IAE's Replacement Lien, the court now returns to its examination of IAE's offer. As identified above, the risk to the value of the Bank's interest in the

---

[20] Including both wholegoods inventory and parts inventory.

IAE Cash Collateral is $8,221,293.99. To protect against this risk, and in addition to the Final Equity Cushion, IAE is offering the Bank the IAE Replacement Lien having a projected value of $12,436,804.05. Because the value of the IAE Replacement Lien is equal to the Bank's anticipated risk to the IAE Cash Collateral resulting from IAE's use of same, the IAE Replacement Lien is sufficient to provide the Bank with adequate protection for IAE's use of the IAE Cash Collateral.

Even though the risk to the value of the Bank's interest in the IAE Cash Collateral is adequately protected by the Final Equity Cushion and the IAE Replacement Lien, IAE is also offering a periodic (weekly) cash payment in the amount of $11,000.00 (the "IAE Weekly Payment"). According to the testimony of the President and owner of each Debtor, this weekly payment represents a full interest payment due to the Bank in connection with the IAE LOC. Hr'g Tr. 70:9–71:11. As was the case with the GVM Weekly Payment, the IAE Weekly Payment does not reduce the principal balance due by IAE to the Bank in connection with the IAE LOC. However, just like the GVM Weekly Payment, the IAE Weekly Payment prevents the accrual of additional interest during this proceeding, and thereby maintains the status quo, which is a primary goal of adequate protection. In this sense, the IAE Weekly Payment is a critical component of IAE's adequate protection offer.

In view of all the foregoing, this court concludes that IAE's offer of adequate protection is sufficient to protect the value of the Bank's interest in the IAE Cash Collateral during this proceeding. Indeed, the Final Equity Cushion may alone be enough to do so. However, any doubt as to the adequacy of IAE's offer is removed given the value of the IAE Replacement Lien. Finally, cash flow is a critical component of any reorganization. IAE's ability to make regular periodic payments to the Bank in an amount sufficient to maintain the status quo is a vital component of IAE's offer, which this court finds sufficient.

### C. __Moneycorp's Objection__

Moneycorp has argued that this court should not reward the Debtors' alleged inappropriate post-petition conduct by granting the Debtors' Motion. The issue presented by Moneycorp is whether the court may use the equitable authority granted to it by § 105(a) to prohibit the Debtors' use of the Cash Collateral even though they have satisfied the conditions of § 363(c). For the reasons set forth below, the court concludes that it may not.

Section 363(c) specifically authorizes a debtor-in-possession to use cash collateral "if each entity that has an interest in such cash collateral consents" or if "the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). As set forth in detail above, the Debtors have satisfied the specific provisions of § 363(c)(2) regarding use of the Cash Collateral. They are therefore entitled to its use. Denying the Debtors use of the Cash Collateral under these circumstances and in the manner suggested by Moneycorp is therefore not possible.

It is true that a bankruptcy court has statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code. 11 U.S.C. § 105(a). The court may also possess inherent power to sanction abusive practices of the kind described by Moneycorp in its objection. *See Law v. Siegel*, 571 U.S. 415, 421 (2014) (citing *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 375–376 (2007)). However, "in exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions." *Law*, 571 U.S. at 421. The Supreme Court of the United States has long held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Code. *Id*. (citations omitted).

Case 1:19-bk-03014-HWV Doc 102 Filed 09/06/19 Entered 09/06/19 11:40:21 Desc
Main Document Page 24 of 25

As a matter of law, the Debtors have satisfied the specific provisions of § 363(c)(2) regarding use of the Cash Collateral in this case. As a matter of law, the Debtors are entitled to use the Cash Collateral during this case. Under these circumstances, the court concludes that § 105(a) does not permit the relief requested by Moneycorp because it would require the court to exercise its equitable powers in contravention of the Code.[21] Moneycorp's Objection must therefore be overruled.

## IV. Conclusion

For all the foregoing reasons, the Debtors' Motion for an Order Pursuant to 11 U.S.C. § 363 to Permit Use of Cash Collateral and Provide Adequate Protection to Parties with Interest in Cash Collateral will be granted. The Debtors' adequate protection proposal protects the value of the Bank's interests in the Cash Collateral as nearly as possible against the identified risks consistent with the concept of indubitable equivalence. The Bank's position relative the Collateral in connection with each of its claims is either not diminishing, is subject to a substantial equity cushion, is protected by periodic payments, a replacement lien on unencumbered post-petition assets, or is being protected through the operation, maintenance or preservation of the Collateral. All of these are recognized forms of adequate protection and are sufficient in this case to protect the value of the Bank's various interests during the course of this proceeding. The Motion is therefore granted.

An appropriate Order will follow.

Dated: September 6, 2019

By the Court,

Henry W. Van Eck, Bankruptcy Judge [JH]

---

[21] There are other reasons why the objection filed by Moneycorp must be overruled. First, the record does not support the entry of an order sustaining the objection on the grounds asserted. Indeed, almost no evidence was presented in support of the Moneycorp Objection at the Hearing. Also, Moneycorp did not assert a lien or other interest in the Cash Collateral. Therefore, Moneycorp is not "an entity that has an interest in [the] property . . . proposed to be used" as required by § 363(e) to invoke standing to object to the Motion. 11 U.S.C. § 363(e).

25